IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

SUZETTE RENEE FELTY,

       Plaintiff,

v.                                              Case No.: 2:19-cv-00232

ANDREW M. SAUL,
Commissioner of the
Social Security Administration,

       Defendant.

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401-433. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Memorandum in Support of Plaintiff's Motion for Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in his favor. (ECF Nos. 11, 12).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's Brief in Support of Judgment on the Pleadings be **DENIED**; the Commissioner's request for

judgment on the pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On July 15, 2015, Plaintiff Suzette Felty ("Claimant") completed an application for DIB, alleging a disability onset date of August 5, 2014 due to "Breast Cancer Stage IIIC, extreme fatigue, chest wall pain, pain in left arm after surgery, frozen shoulder, pain and numbness in both feet, pain in both lower legs, upper leg pain in both legs, hip pain both sides, and anxiety due to illness and finances." (Tr. at 319-20, 348). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 244-48, 253-55). Claimant then filed a request for an administrative hearing, which was held on January 5, 2018 before the Honorable Julianne Hostovich, Administrative Law Judge. (Tr. at 181-214). By written decision dated March 28, 2018, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 9-27). The ALJ's decision became the final decision of the Commissioner on January 29, 2019 when the Appeals Council denied Claimant's request for review. (Tr. 1-8).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 7, 8). Thereafter, Claimant filed a Brief in Support of Judgment on the Pleadings, and the Commissioner filed a Brief in Support of Defendant's Decision to which Claimant filed a reply. (ECF Nos. 11, 12, 13). Consequently, the matter is fully briefed and ready for resolution.

## II.     Claimant's Background

Claimant was 49 years old on her alleged onset date and 53 years old on the date of the ALJ's decision. (Tr. at 345). She has a high school education, completed two years of college, and communicates in English. (Tr. at 347, 349). Claimant previously worked as benefits manager and shoe sales clerk. (Tr. at 204).

## III.     Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. § 404.1520(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* § 404.1520(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 404.1520a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* § 404.1520a(c). Third, after rating the degree of

4

functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 404.1520a(d). A rating of "none" or "mild" in the four functional areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* § 404.1520a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2020. (Tr. at 14, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since August 5, 2014, the alleged onset date. (Tr. at 15, Finding No. 2). At the second step of the evaluation, the ALJ found that

Claimant had the following severe impairments: history of cancer, polyneuropathy, fibromyalgia, carpal tunnel syndrome, degenerative disc disease, and frozen shoulder. (Tr. at 15-16, Finding No. 3). The ALJ also considered Claimant's depression, anxiety, and diabetes mellitus, but concluded that the impairments were non-severe. (Tr. at 15-16).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 16-17, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except with occasionally climbing ramps and stairs, never climbing ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; no overhead reaching with the left upper extremity; and frequently handle, finger and feel with the right upper extremity.

(Tr. at 17-21, Finding No. 5).

At the fourth step, with the assistance of a vocational expert ("VE"), the ALJ determined that Claimant could perform her past relevant work as a benefits manager. (Tr. at 21-22, Finding No. 6-7). Therefore, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 22, Finding No. 7).

## IV.    **Claimant's Challenge to the Commissioner's Decision**

Claimant asserts four challenges to the Commissioner's decision. First, Claimant contends that the ALJ failed to adequately explain the weight that she ascribed to the state agency physicians' opinions that Claimant could never reach in any direction with her left upper extremity. (ECF No. 11 at 5-6). Claimant asserts that the ALJ stated in the

decision that she gave the experts' opinions little weight because subsequent evidence received at the hearing supported more restrictive limitations. However, the ALJ incongruently assessed the less restrictive limitation that Claimant could never reach *overhead* with her left upper extremity, as opposed to any direction. Claimant argues that the ALJ was obligated to either adopt the experts' proposed RFC limitation or sufficiently explain her rationale for rejecting it.

In her second challenge to the Commissioner's decision, Claimant asserts that the ALJ misclassified her prior work as a benefits manager to be a sedentary position when it was actually a composite job that required more strenuous work tasks as described by Claimant; such as, that she was required to walk three to five hours per day and carried up to 20 pounds in files, paper, and computer supplies. (*Id.* at 6-7). In her third challenge, Claimant alleges that the ALJ erred at step two of the sequential evaluation by finding that Claimant's depression was a non-severe impairment and by subsequently failing to include limitations in the RFC finding to account for the depression. (*Id.* at 7-9). Claimant notes that her treating physician documented her decreased attention and concentration and suicidal ideation, and the consulting state agency psychologist, Dr. Cloonan, found that she was moderately limited in several functional areas. (*Id.* at 8). Claimant states that the ALJ was required to provide reasons for rejecting such assessment. (*Id.*). Finally, in her fourth challenge, Claimant argues that the ALJ failed to include RFC limitations related to her fatigue. (*Id.* at 9-10).

In response to Claimant's first argument, the Commissioner contends that the ALJ properly explained her rationale for rejecting the opinions that Claimant could never reach with her left upper extremity. (ECF No. 12 at 8). The Commissioner cites to the ALJ's findings that, although Claimant's physician noted that Claimant had difficulty

abducting her left shoulder, he subsequently documented that she had normal motor strength and tone and movement, and had normal movement of all extremities. (*Id*.). The Commissioner asserts that the ALJ also relied on the fact that Claimant reported moving better after physical therapy; her physician found that she had a good range of motion in her shoulders; and Claimant was capable of completing a variety of daily activities. (*Id*. at 9). As to Dr. Cloonan's opinion regarding Claimant's mental functions, the Commissioner argues that the ALJ properly explained that it was inconsistent with Claimant's conservative mental health treatment, lack of exacerbation or worsening of symptoms, and Claimant's daily activities. (*Id*.).

Regarding the classification of Claimant's past work, the Commissioner contends that the ALJ was not required to find that Claimant could return to her past job as she actually performed it. (*Id*. at 10). Rather, according to the Commissioner, the ALJ reasonably relied on the VE's testimony that Claimant could perform her past relevant work as it is generally performed in the national economy. (*Id*. at 11). Furthermore, the Commissioner argues that Claimant's former job as a benefits manager was not a composite job because it does not have significant elements of two or more occupations; rather, it has a direct counterpart in the DOT. (*Id*. at 12). Finally, the Commissioner asserts that substantial evidence supports the ALJ's conclusions that Claimant's mental impairments were non-severe and that her fatigue did not warrant additional RFC limitations. (*Id*. at 12-20).

Claimant's reply argues that the Commissioner improperly supplies *ex post facto* reasoning for the ALJ's decision, but the ALJ failed to provide adequate explanation in the first instance. (ECF No. 13).

## V.    Relevant Evidence

The undersigned has reviewed all of the evidence before the Court. The following evidence is most relevant to the issues in dispute.

### A. Treatment Records

Claimant was diagnosed with breast cancer on July 8, 2014. (Tr. at 704, 824). She underwent chemotherapy in August through October 2014 and had a double mastectomy on December 9, 2014. (Tr. at 702, 716, 824).

During Claimant's follow-up appointment with her oncologist, Justin Cohen, M.D., on February 13, 2015, Claimant was clinically free of disease, and was scheduled to begin radiation therapy in the near future. (Tr. at 915). Claimant complained of stiffness in her shoulders following surgery, and Dr. Cohen diagnosed her with frozen shoulder. (Tr. at 915, 921). Claimant additionally began taking Effexor for "some previously unrecognized, mild depression." (Tr. at 884).

On May 13, 2015, Claimant reported to Dr. Cohen that she suffered from significant fatigue and weakness, which Dr. Cohen believed to be caused by chemotherapy, surgery, and radiation. (Tr. at 913). He noted that Claimant was also "to some extent deconditioned." (*Id.*). Dr. Cohen recorded that Claimant was too weak to work at that time, and he hoped that she could return to work in a couple of months. (*Id.*).

Claimant stated to Dr. Cohen during her July 9, 2015 follow-up appointment that she had not noticed significant improvement in her energy level since finishing radiation treatments at the end of April. (Tr. at 901). Claimant reported that she felt fatigued all day, every day, and it was causing her difficulty woodworking. (Tr. at 906). Dr. Cohen still believed that Claimant's fatigue resulted from her prior chemotherapy and

surgeries. (*Id*.). Based on her fatigue, "fairly serious neuropathy," open wound in her chest wall from her mastectomy, and other issues related to therapy and medical conditions, Dr. Cohen documented that it was reasonable to state that Claimant could still not work at that time. (*Id*.). He stated that it was not clear for how long her disability would persist. (*Id*.).

Claimant presented to Dr. Cohen again on October 7, 2015. She had some tethering of her left shoulder that made it difficult to abduct her shoulder. (Tr. at 892). Her left mastectomy wound was almost healed, but she had some mild residual erythema and induration and a lot of scarring of the underlying muscle and bone. (Tr. at 897). Dr. Cohen discussed in detail with Claimant how to gradually stretch out her shoulders. (*Id*.). Claimant still complained of significant fatigue, and Dr. Cohen believed that, given the length of time since Claimant completed chemotherapy, her fatigue was likely caused by neuropathy and deconditioning. (*Id*.). He prescribed Cymbalta to hopefully control Claimant's neuropathy and advised her to increase her physical activity. (*Id*.).

On November 13, 2015, Claimant complained to Dr. Cohen that she had worsening depression. (Tr. at 884). Dr. Cohen remarked that Claimant seemed to be reasonably strong, but fatigued in appearance, and also appeared depressed and occasionally tearful during her appointment. (Tr. at 888-89). He believed that her fatigue was related to discomfort, insomnia, as well as hypersomnolence that could be a manifestation of depression or a side effect of medication. (*Id*.). Dr. Cohen noted that Cymbalta was known to cause hypersomnolence, so he discontinued Cymbalta and resumed Claimant's prescription for low-dose Effexor. (*Id*.). On examination, Claimant was oriented in all spheres with no agitation or anxiety and with appropriate behavior,

normal attention span and concentration, and no other psychiatric issues. (Tr. at 889).

On November 24, 2015, Jennifer Hancock, Psy.D., performed a psychiatric diagnostic evaluation concerning Claimant's depression. (Tr. at 879). Claimant stated that she was depressed throughout her life, but it was never this severe, and she attributed her mental symptoms to the "long lasting effects of her cancer treatment." (*Id.*). Claimant reported moderate symptoms, but acknowledged that she had moderate functional improvement since the onset of her symptoms, as she was prescribed Effexor and Cymbalta by her primary care physician and oncologist. (Tr. at 879-80). Claimant stated that Cymbalta was not helpful, but she continued to take Effexor. (Tr. at 880-81). Dr. Hancock diagnosed Claimant with moderate, recurrent major depressive disorder. (Tr. at 877). She scheduled Claimant for cognitive behavior therapy and referred her to a family nurse practitioner for a survivorship care planning appointment. (Tr. at 882).

During Claimant's subsequent appointment with Dr. Cohen on December 9, 2015, Claimant's mood was improved, and she was tolerating Effexor well, although she still reported moderate depression. (Tr. at 868). Claimant next saw Billie Thomas, FNP-BC, at CAMC Cancer Center on December 17, 2015. Her cancer remained in remission. (Tr. at 862). She was restricted in her ability to perform some physical activities, but could perform normal daily activities with effort. (Tr. at 857). Claimant again reported fatigue due to treatment, and Nurse Thomas encouraged 30 minutes of activity five days per week. (Tr. at 862). Nurse Thomas also referred Claimant to a physical therapist for her decreased range of motion in her left shoulder, which she attributed to her surgery and radiation therapy. (*Id.*). Claimant had a psychotherapy session with Dr. Hancock on the same day, and Dr. Hancock noted that Claimant was making some minimal progress. (Tr. at 865).

During her follow-up appointment with Dr. Cohen on February 19, 2016, Claimant was restricted in some physical activities, but she could still perform normal daily activities with effort. (Tr. at 849). Her depression was significantly better than on her last visit, but it was not resolved to her satisfaction. (Tr. at 854). Claimant had two more psychotherapy sessions with Dr. Hancock on March 22 and April 20, 2016, during which Dr. Hancock noted that Claimant was making some progress. (Tr. at 835, 846). On April 20, 2016, Dr. Cohen recorded that Claimant was fully active and able to perform all normal activities. (Tr. at 838). She had normal muscle strength and reflexes. (Tr. at 843). However, Dr. Cohen increased Claimant's dosage of Effexor, because Claimant stated that her depression was not controlled. (*Id.*).

On May 4, 2016, Claimant began physical therapy to improve the range of motion in her left shoulder and arm. (Tr. at 743). Two days later, she began seeing primary care provider, Deborah Spurlock, FNP. (Tr. at 963). Claimant stated that she had been under a lot of stress and was treated by Dr. Hancock for depression. (*Id.*). Claimant reported fatigue, but her psychiatric and musculoskeletal examinations were normal, including normal movement of all extremities, as well as normal muscle tone and strength. (Tr. at 964). Nurse Spurlock noted the same examination results on May 10, 2016. (Tr. at 960). She ordered blood tests for Claimant's reported fatigue. (Tr. at 965). The following day, Claimant saw Dr. Hancock for a psychotherapy session, and continued to show minimal progress with treatment. (Tr. at 832).

Claimant reported to Nurse Spurlock during a subsequent visit on May 20, 2016 that she suffered from anxiety, but not depression. (Tr. at 955). On examination, Claimant still had normal movement of all extremities, as well as normal muscle tone and strength. (Tr. at 956). Claimant told her physical therapist, J. Michael Elliott, DPT,

on May 26, 2016 that she could now use her left arm to help wash her hair. (Tr. at 733). Her active range of motion was improved in all directions. (*Id*.). Claimant likewise told Dr. Elliott on June 1, 2016 that she could tell that she was moving better and was progressing. (Tr. at 732).

On June 20, 2016, Nurse Spurlock recorded that Claimant continued to complain of fatigue, but denied depression. (Tr. at 951). Claimant still had normal movement of all extremities, as well as normal muscle tone and strength. (Tr. at 952). Three days later, on June 23, 2016, Dr. Elliott stated that Claimant was improving with her left upper extremity activities of daily living. (Tr. at 729). He documented that Claimant participated in eight visits, but had stopped attending physical therapy, and he recommended that Claimant be discharged due to her not returning to the clinic. (*Id*.). Dr. Elliott stated that Claimant's motion, flexion, abduction, and internal and external rotation had all improved from therapy. (*Id*.).

During Claimant's follow-up appointment with Dr. Cohen on July 19, 2016, Claimant remained restricted in some physical activity, but she could still perform normal activities with effort. (Tr. at 824). Claimant had some depression and anxiety for which she was still taking Effexor. (*Id*.). Dr. Cohen diagnosed Claimant with generalized anxiety disorder. (Tr. at 829). On August 1, 2016, Claimant reported to Nurse Spurlock that she had ongoing fatigue, but she denied depression. (Tr. at 946). Claimant retained normal movement of all extremities, as well as normal muscle tone and strength. (Tr. at 947).

On October 26, 2016, Claimant saw rheumatologist Thomas W. Howard, M.D., for her chronic myalgias, arthralgias, and fatigue. (Tr. at 974). Claimant also reported anxiety and depression to Dr. Howard. (Tr. at 976). On examination, Claimant's

shoulders showed good range of motion. (*Id*.). She had tender points in her back in a pattern consistent with fibromyalgia, and Claimant was re-started on a low dose of gabapentin in the evening for fibromyalgia and neuropathy. (*Id*.). Dr. Howard advised Claimant to have a more active lifestyle to self-manage her fibromyalgia. (*Id*.). She was instructed to avoid daytime naps and begin an exercise and fitness routine. (*Id*.).

Claimant saw Nurse Spurlock on November 1, 2016; January 31, May 1, and October 11, 2017; and January 11, 2018. At all visits, Claimant continued to have normal movement in her extremities, as well as normal muscle tone and strength. (Tr. at 58, 989, 994, 998, 1107). Nurse Spurlock advised Claimant to exercise. (Tr. at 994). Claimant reported depression and/or fatigue at her initial visits, but she denied both conditions on January 11, 2018. (Tr. at 57).

Claimant presented to Dr. Cohen on February 9, 2018. She still complained of fatigue ever since finishing chemotherapy, but she showed no signs of relapse of breast cancer. (Tr. at 72). Dr. Cohen noted that Claimant was still on Effexor for depression, and he advised her to let him know if it ever worsened. (Tr. at 73). When Claimant saw Nurse Spurlock on April 11, 2018, she denied fatigue and depression. (Tr. at 47). Her mental and musculoskeletal examinations were normal, including normal movement of all extremities, and normal muscle tone and strength. (*Id*.).

On November 2, 2018, Claimant told Dr. Cohen that she suffered from depression and that she became fatigued and had pain when she used her arms and legs. (Tr. at 66-67). Dr. Cohen prescribed pain medication, stating that Claimant could use it to be more functional, but he cautioned her that he would not increase the dose. (Tr. at 67). Claimant saw Nurse Spurlock later that month on November 21, 2018. (Tr. at 42). Claimant reported generalized weakness and fatigue, but she did not report any

psychiatric issues, and she still had normal muscle tone, motor strength, and range of movement in all extremities. (Tr. at 42-43). Nurse Spurlock renewed Claimant's medications for depression and fatigue. (Tr. at 43).

### B. Evaluations and Opinions

On July 13, 2015, Dr. Cohen wrote a letter stating that Claimant was unable to work for the next 12 months due to substantial, residual fatigue from prior chemotherapy, radiation, and multiple surgeries. (Tr. at 900). Dr. Cohen stated that Claimant additionally suffered from worsening neuropathy and an open wound in her left chest wall. (*Id*.).

On August 28, 2015, state agency physician, Dominic Gaziano, M.D., assessed Claimant's physical RFC based upon his review of her records. Dr. Gaziano opined that Claimant could perform a limited range of light work, which never required her to reach in any direction with her left upper extremity due to her frozen shoulder. (Tr. at 221-23). Subhash Gajendragadkar, M.D., affirmed the RFC assessment on March 11, 2016. (Tr. at 235-37).

On April 4, 2016, Dr. Hancock provided an opinion stating that Claimant reported mental symptoms, but she had no issues with activities of daily living. (Tr. at 725). Dr. Hancock recounted that Claimant attended three psychotherapy sessions, failed to appear for one session, and did not reschedule for three months, citing her severe depression as the reason why she did not show up for her appointment. (*Id*.). Dr. Hancock assessed that Claimant's social functioning and concentration were moderately deficient based on Claimant's self-report, but Dr. Hancock concluded that Claimant's pace was only mildly deficient based on observation. (Tr. at 726).

Later that month, on April 12, 2016, state agency psychologist, Holly Cloonan, Ph.D., assessed Claimant's mental RFC based upon Claimant's records. Dr. Cloonan opined that Claimant had moderate limitations in maintaining social functioning and concentration, persistence, or pace, and mild limitation in activities of daily living. (Tr. at 233). She assessed that Claimant was moderately limited in understanding, remembering, and carrying out detailed instructions; maintaining concentration and attention for extended periods; performing activities within a schedule; maintaining regular attendance; being punctual within customary tolerances; working in coordination with or in proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; and interacting appropriately with the general public. (Tr. at 237-38). Dr. Cloonan concluded that Claimant could learn, remember, and perform routine work-like activities involving simple instructions in settings that did not require meeting production line schedules or more than occasional interactions with the general public. (Tr. at 239).

### C. Claimant's Statements

On July 27, 2015, Claimant completed an Adult Function Report, stating that she could not work due to "extreme fatigue and pain and numbness in both feet," as well as "pain in both legs and hips [and] left arm," and limited movement in her arms, especially her left arm. (Tr. at 356). Her daily activities included drinking coffee, eating, napping, reading, and watching television. (Tr. at 360, 363). Claimant listed that she had no difficulty dressing herself, bathing, caring for her hair, shaving, feeding herself, or using the toilet. (Tr. at 360). She did not need any reminders to take care of her personal needs

16

or grooming, but she set alarms to remind her to take her medications. (Tr. at 361). Claimant stated that she could only make simple meals, because she would become exhausted and was unable to stand for very long. (Tr. at 361). Claimant sometimes washed dishes and drove, and her friends and family took her to the grocery store twice per month, but she had to rest after 15 minutes while grocery shopping. (Tr. at 361-62). Claimant stated that she could pay bills, count change, handle a savings account, and use a checkbook/money orders. (*Id.*). She spent time with family and friends daily on the telephone, computer, or when they visited her. (Tr. at 363). She had no trouble with concentration, could finish what she started, and follow instructions. (Tr. at 364). Claimant stated that she got along with authority figures, but did not handle stress very well. (Tr. at 365). On the same date, Claimant completed a pain questionnaire, stating that her upper left arm was tender to palpation and it was painful to lift or stretch her arm above her shoulder. (Tr. at 371).

On January 5, 2018, Claimant testified at her administrative hearing. She related that she was very healthy with no medical problems before she was diagnosed with and treated for breast cancer. (Tr. at 193). She testified that her mastectomy surgery locked her left shoulder. (Tr. at 188). Claimant stated that she could not raise her arm "real high" or put it behind her back, and she could not carry a lot of weight with that arm. (Tr. at 188, 198). Claimant testified that she had to be cautious because certain movements shot pain through her arm. (*Id.*). She stated that she also suffered from daily fatigue due to pain. (Tr. at 192). As a result, other people had to do tasks for her that she used to do independently, which made her depressed and angry. (*Id.*). She napped approximately two to three times per day for 30 minutes to two hours each time. (Tr. at 193). Claimant stated that she was unable to do any chores, did not grocery shop, and

could barely shower on her own. (Tr. at 199). Claimant further testified that she had crying spells and problems with her concentration and memory to the point that she could not stay focused to read a book anymore and always forgot what she was doing, even forgetting simple words when she was having a conversation. (Tr. at 194-96). For her depression, Claimant's family physician prescribed Cymbalta, and her oncologist prescribed Effexor. (Tr. at 200). Claimant acknowledged that she only saw a psychologist for a few psychotherapy sessions before she stopped going because the psychologist kept "pushing" group therapy. (*Id.*). Claimant stated that she also discontinued physical therapy for her shoulder because "it wasn't really doing much good." (*Id.*).

### D. VE Testimony

The VE testified at Claimant's administrative hearing that Claimant's past work as a benefits manager was a sedentary skilled position listed in the Dictionary of Occupational Titles with a representative number of DOT 166.167-018. (Tr. at 204). The VE testified that based on Claimant's description that she carried laptops, boxes of paper to fill the copier, and other items, the job as Claimant actually performed it was a medium exertional level position. (Tr. at 210-11). However, the expert reiterated that the job, as it is generally performed, was a sedentary position. (*Id.*). The ALJ specifically asked the VE if Claimant's job as a benefits manager was a composite position, such as also involving the tasks of a stocking clerk. (*Id.*). The expert explicitly stated that it was not a composite job. (*Id.*). The VE testified that someone with Claimant's characteristics and RFC could work as a benefits manager. (Tr. at 206).

### VI.    <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is

18

based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.  Discussion

Claimant challenges the ALJ's analysis regarding her left upper extremity, the classification of her past relevant work, the severity and limitations of her depression, and the functional limitations of her fatigue. Each argument is considered below, in turn.

### A. *Left Upper Extremity*

Claimant's first criticism of the Commissioner's decision is that the ALJ did not adequately explain in her RFC assessment why she rejected the state agency physicians' opinions that Claimant could never reach in any direction with her left upper extremity and, instead, found a less restrictive limitation—that Claimant could never reach overhead—to be appropriate.

Social Security Ruling 96-8p (SSR 96-8p) provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. Among other functions, the ALJ must assess an individual's manipulative functions, such as the ability to reach. *Id.* at *1; 20 CFR § 404.1545(b-d). In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. Finally, the "RFC assessment must always consider and address medical source opinions," and, if "the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

In this case, the ALJ noted that Claimant complained of loss of left shoulder function secondary to surgery, and the ALJ cited that Claimant's oncologist, Dr. Cohen,

diagnosed Claimant with left arm pain, frozen shoulder, and some difficulty with left shoulder abduction following her mastectomy. (Tr. at 18). However, the ALJ cited Dr. Cohen's clinical notes that Claimant could perform normal activities with effort and that her functional abilities continued to improve following surgery, even noting on April 20, 2016 that Claimant was fully active and able to perform all normal activities. (Tr. at 19). The ALJ further cited Claimant's medical records, documenting Claimant's normal muscle tone and strength and normal movement in all of her extremities. (*Id.*). In addition, the ALJ discussed that Claimant had eight physical therapy sessions for her left shoulder from May to June 2016, and her therapist noted at the last session that Claimant was progressing and moving her arm better; there were no records indicating additional therapy. (*Id.*). The ALJ explained that Claimant's diagnosis of frozen shoulder would preclude repetitive reaching overhead, but Claimant could perform her activities of daily living, including caring for her hair, dressing, and grooming. (Tr. at 20). The ALJ considered the state agency physicians' opinions that Claimant could perform a range of light work with no reaching in any direction with the left upper extremity. (*Id.*). However, the ALJ gave the opinions little weight, stating that subsequent evidence received at the hearing level supported that Claimant was more limited due to right carpal tunnel syndrome, degenerative disc disease, fibromyalgia and polyneuropathy, and fatigue. (*Id.*).

As stated, the ALJ was required under the law to explain her reasons for rejecting the state agency physicians' opinions that Claimant could not reach in any direction with her left upper extremity. The ALJ did so in this case. While the precise format of her discussion does not satisfy Claimant, the ALJ's reasoning is nonetheless readily apparent and contained in the four corners of the decision. The ALJ explained that

despite Claimant's subjective symptoms and diagnoses related to her left shoulder, Claimant's treating physicians documented her normal functional abilities and physical examination findings; her physical therapist noted her improvement without any evidence of further therapy; and Claimant was able to perform daily activities that were inconsistent with an inability to reach in any direction with her left upper extremity. The ALJ expressly noted the state agency physicians' opinions, including their assessments that Claimant could never reach in any direction with her left arm. However, the ALJ gave the opinions little weight for the reasons stated. The ALJ then explained why she included more restrictive exertional limitations and right hand manipulative limitations than the agency physicians assessed. (Tr. at 20). The fact that the ALJ focused on other manipulative and exertional limitations when finding that the opinions of the agency physicians were not particularly persuasive does not diminish the ALJ's stated reasons for finding that Claimant's ability to reach with her left arm was only limited in her capacity to perform overhead reaching.

Given that the ALJ provided sufficient explanation and citations to the record to allow for meaningful review of her RFC assessment regarding Claimant's left upper extremity, the undersigned examines whether the assessment is supported by substantial evidence. Notably, although Dr. Cohen diagnosed Claimant with frozen shoulder, and she underwent a short course of physical therapy in May and June 2016, her records consistently documented her normal range of movement in all of her extremities, and her normal muscle strength and tone, precisely as the ALJ discussed. (Tr. at 43, 47, 58, 947, 952, 956, 960, 964, 989, 994, 998). Claimant's physical therapist indeed noted her improvement, and Dr. Cohen documented that Claimant could perform normal activities. (Tr. at 729, 732, 824, 838, 849). Claimant stated in July 2015

22

that she had no trouble with dressing herself, bathing, caring for her hair, shaving, feeding herself, or using the toilet, and she stated only that she had pain raising her left arm *above the shoulder*. (Tr. at 360, 371). In January 2018, she testified that she could not raise her left arm very high, put her arm behind her back, or carry much weight with her left arm due to her locked shoulder. (Tr. at 188, 198). In sum, there is more than a scintilla of evidence to support the ALJ's RFC assessment, and it must remain undisturbed by the Court. *Blalock*, 483 F.2d at 776 (stating that substantial evidence is "more than a mere scintilla of evidence," and the Court must uphold the Commissioner's decision so long as it is supported by substantial evidence).

Based on the above, the undersigned **FINDS** that the ALJ's RFC assessment of Claimant's ability to reach with her left upper extremity is supported by substantial evidence.

### B. Past Relevant Work

In her second challenge to the Commissioner's decision, Claimant argues that the ALJ misclassified the strength requirements of her prior work as a benefits manager by considering only the lightest duties performed, when the position, as Claimant actually performed it, was a composite job requiring more strenuous work activity. (ECF No. 11 at 6-7). Claimant contends that the VE classified her past relevant work as sedentary without addressing the composite aspects of her prior work activity. (*Id.* at 7).

Under the fourth step of the sequential evaluation process, the ALJ must determine a claimant's RFC and, in turn ascertain whether the claimant is capable of performing past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Past relevant work is "work that [a claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the individual] to learn to do it." 20 C.F.R. §

404.1560(b)(1); *see also* 20 C.F.R. § 404.1565(a).

Social Security Ruling 82-61 explains that there are three possible tests to determine if a claimant can perform his or her past relevant work. SSR 82-61, 1982 WL 31387, at *1 (S.S.A. 1982). First, an ALJ can examine whether the claimant has "the capacity to perform a past relevant job based on a broad generic, occupational classification of that job, e.g., "delivery job," "packaging job," etc." *Id*. However, "[f]inding that a claimant has the capacity to do past relevant work on the basis of a generic occupational classification of the work is likely to be fallacious and unsupportable" due to the varying functional demands and duties within a generic job category. *Id*. A second option is that the ALJ may consider whether the claimant can "perform the particular functional demands and job duties peculiar to an individual job as he or she actually performed it." *Id*. Finally, as the ALJ elected in this instance, an ALJ can, as a third option, examine whether the claimant can "perform the functional demands and job duties of the job as ordinarily required by employers throughout the national economy." *Id*. at *2. Under the third option, "The *Dictionary of Occupational Titles* (DOT) descriptions can be relied upon--for jobs that are listed in the DOT -- to define the job as it is *usually* performed in the national economy." *Id*. Where there is a significant variance between a claimant's description of the past work and the DOT description, an ALJ may consult a VE to determine how a particular job is usually performed. *Id*.

The Ruling expressly contemplates that some claimants may not be able to return to their past relevant work as they actually performed it, but they can return to the position as it is generally performed. It states:

It is understood that some individual jobs may require somewhat more or less exertion than the DOT description.

A former job performed in by the claimant may have involved functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy. Under this test, if the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be "not disabled."

*Id.*

The Ruling makes abundantly clear that "a claimant will be found to be "not disabled" when it is determined that he or she retains the RFC to perform:

1. The actual functional demands and job duties of a particular past relevant job; *or*

**2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy.**

*Id.* (emphasis added). A composite position, which is mentioned by Claimant in her brief, is a job that has "significant elements of two or more occupations and, as such, ha[s] no counterpart in the DOT." *Id.*

In the present matter, the ALJ solicited testimony from the VE regarding Claimant's vocational profile at Claimant's administrative hearing. The VE testified that Claimant's past work as a benefits manager was a sedentary skilled position with a standard vocational preparation rating of 7 and a representative DOT number of 166.167-018. (Tr. at 204). The VE testified that based on Claimant's description that she carried laptops, boxes of paper to fill the copier, and other items, the job as Claimant actually performed it was a medium exertional level position. (Tr. at 211). However, the expert stated that the job, as it is generally performed, is a sedentary position. (*Id.*). The ALJ specifically asked if Claimant's past job as a benefits manager was a composite

position, such as also involving the tasks of a stocking clerk. (*Id.*). The expert explicitly stated that it was not a composite job. (*Id.*). The VE testified that someone with Claimant's RFC could work as a benefits manager. (Tr. at 206). The ALJ thus concluded that Claimant could work as a benefits manager. (Tr. at 21-22).

Based on the above, there is simply no merit to Claimant's challenge to the ALJ's step four analysis and finding. The exertional nature of Claimant's past work was directly addressed by the VE, and the ALJ relied on the VE's testimony to conclude that Claimant could perform the job of benefits manager, as it is generally performed in the national economy. As identified by the VE, Claimant's past work was not a composite job, with no counterpart in the DOT, but rather Claimant's past work corresponded directly to DOT 166.167-018. The fact that the exertional or functional requirements of the job as Claimant actually performed it were in excess of the DOT definition, does not make it a composite position. In fact, SSR 82-61 expressly accounts for the instant situation in which Claimant's former job involved "functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy." SSR 82-61, 1982 WL 31387, at *1. The ALJ was only required to find that Claimant could perform the "job duties as generally required by employers throughout the economy." *Id.* In this case, the ALJ consulted a VE and made a step four finding to conclude that Claimant could return to her past relevant work. (Tr. at 21).

Therefore, the undersigned **FINDS** that the ALJ's step four analysis of Claimant's past relevant work and determination that Claimant could return to her past position as a benefits manager is supported by substantial evidence.

### C. Depression

In the third challenge to the ALJ's decision, Claimant argues that the ALJ erred

in finding that her depression was a non-severe impairment and failing to include mental RFC limitations. (*Id.* at 7-9). Claimant states that the ALJ was required to provide reasons for rejecting the opinion of the non-examining psychologist, Dr. Cloonan, who assessed that Claimant was moderately limited in several functional areas based upon her review of Claimant's records. (*Id.*).

At the second step of the sequential evaluation process, the ALJ concludes whether the claimant has an impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is considered "severe" if it significantly limits a claimant's ability to do work-related activities. 20 C.F.R. § 404.1522(a); SSR 96-3p, 1996 WL 374181, at *1. "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (citing SSR 85-28, 1985 WL 56856). As relevant to the instant matter, basic work activities include understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1522(b).

As discussed, when a claimant alleges a mental impairment, the ALJ must apply the special technique at step two of the analysis. If the ALJ determines that the claimant has a medically determinable mental impairment, the ALJ rates the degree of functional limitation in four broad categories, known as the "paragraph B" criteria, which include: (1) understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself. 20 C.F.R. § 404.1520a(c). A rating of "none" or "mild" in the foregoing criteria will result in a finding that the impairment is not severe unless the evidence indicates

that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1).

Importantly, the claimant bears the burden of proving that an impairment is severe, *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983), and does this by producing medical evidence establishing the condition and its effect on the claimant's ability to work. *Williamson v. Barnhart,* 350 F.3d 1097, 1100 (10th Cir. 2003). The mere presence of a condition or ailment is not enough to demonstrate the existence of a severe impairment. Moreover, to qualify as a severe impairment under step two, the impairment must have lasted, or be expected to last, for a continuous period of at least twelve months and must not be controlled by treatment, such as medication. *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). If the ALJ determines that the claimant does not have a severe impairment or combination of impairments, a finding of not disabled is made at step two, and the sequential process comes to an end. On the other hand, if the claimant has at least one impairment that is deemed severe, the process moves on to the third step. "[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert,* 482 U.S. 137, 153-54 (1987)); *see also Felton–Miller v. Astrue,* 459 F. App'x 226, 230 (4th Cir. 2011) ("Step two of the sequential evaluation is a threshold question with a de minimis severity requirement.").

In evaluating the evidence at step two or subsequent steps of the sequential evaluation, the regulations in effect at the time of Claimant's application for benefits— and, thus, the regulations governing the ALJ's review—suggested "a hierarchy of medical opinions, with opinions by treating physicians generally being afforded the greatest weight, followed by examining sources, and finally, nonexamining sources." *Cook v.*

*Colvin*, No. 2:15-CV-07181, 2016 WL 5661348, at *3 (S.D.W. Va. Sept. 29, 2016) (quoting *Bevans v. Colvin*, No. 3:13–12502, 2014 WL 4925431, at *3 (S.D. W. Va. Sept. 30, 2014)). A treating physician's opinion should be given controlling weight when the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.* Regardless of source, an ALJ was required to evaluate every medical opinion in accordance with the following factors: (1) whether the source has examined the claimant and the length and frequency of the examinations; (2) the nature and extent of any treatment relationship; (3) the extent to which the source's opinion is supported by the medical evidence in the record; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is rendered by a specialist in his or her area of specialty; and (6) other relevant factors." *Id.*; *see* 20 C.F.R. § 404.1527(c). However, while the ALJ had to consider the relevant factors, the ALJ was not required to explicitly discuss each factor. *See Hardy v. Colvin*, No. 2:13-CV-20749, 2014 WL 4929464, at *2 (S.D.W. Va. Sept. 30, 2014).

As pertinent to this case, an "ALJ is not bound by the findings of state agency psychologists, although he [or she] must consider the findings as opinion evidence from highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." *Cook*, 2016 WL 5661348, at *3 (quoting *Bellamy v. Astrue*, No. 2:10CV00084, 2011 WL 3679079, at *5 (W.D. Va. Aug. 23, 2011)). Furthermore, although an ALJ was required under the former regulations to give "good reasons" before rejecting the opinion of a treating source, there was no such requirement for non-treating source opinions. *Id.* Rather, the ALJ was simply required to provide an explanation that was "sufficiently clear so that a court may meaningfully review the ALJ's weighing of the opinion." *Id.* (quoting *Miller v. Colvin*, 2:13–cv–31251, 2015 WL

917772, at \*18 (S.D. W. Va. Mar. 3, 2015)); *see also Bryant ex rel. Bryant v. Barnhart*, 63 Fed. Appx. 90, 95 (4th Cir. 2003). Critically, an ALJ's determination as to the weight to be assigned to a medical opinion is generally not disturbed absent some indication that the ALJ dredged up specious inconsistencies or did not give good reason for the weight afforded to a particular opinion. *Id.* (citing *Koonce v. Apfel*, 166 F.3d 1209, 1999 WL 7864, at \*2 (4th Cir. 1999)).

Here, the ALJ found at step two of the analysis that Claimant's depression and anxiety were medically determinable impairments. (Tr. at 15). Thus, the ALJ performed the special technique to evaluate whether Claimant's mental impairments caused more than minimal limitation in Claimant's ability to perform basic mental work activities. (Tr. at 15-16). In the first functional area of understanding, remembering, or applying information, the ALJ found that Claimant was only mildly limited, noting that despite Claimant's reported memory problems, she stated that she could drive, pay bills, count change, handle a savings account, manage a checkbook, and use a computer. (Tr. at 15). The ALJ likewise found that Claimant was only mildly limited in the second functional area of interacting with others, noting that Claimant spent time visiting with family and friends, attended medical appointments, talked on the phone, and shopped for groceries. (*Id.*). In the area of concentration, persistence, or pace, the ALJ found that Claimant was mildly limited because she could drive, use a computer, watch television, manage household finances, do woodworking, and perform some household chores. (*Id.*). Furthermore, the ALJ cited that Claimant's attention and concentration were normal during her psychiatric assessment. (*Id.*). Finally, in the area of adapting or managing herself, the ALJ found that Claimant had mild limitation given the fact that Claimant was prescribed only medication for her psychological symptoms, interacted

appropriately in the clinical setting, independently attended medical appointments, visited with others, chatted on the telephone, shopped for groceries, used the computer, and managed her finances. (Tr. at 16). Accordingly, the ALJ found no significant evidence that Claimant could not regulate her emotions, control her behavior, or maintain well-being in a work setting. (*Id.*). Ultimately, based on the fact that Claimant had no more than mild functional limitations as a result of her mental impairments, the ALJ concluded that Claimant's depression and anxiety were non-severe.

Claimant contends that the record demonstrates that her mental impairments were more than slight abnormalities that imposed more than a minimal effect on her ability to do basic work activities. (ECF No. 11 at 8). She relies on the facts that she was treated for anxiety and depression; Dr. Hancock noted decreased attention and concentration; and Dr. Cloonan assessed moderate mental restrictions. (*Id.*). However, the ALJ expressly considered the evidence concerning Claimant's mental impairments, including the opinions of her treating psychologist, Dr. Hancock, and the non-examining state agency psychologist, Dr. Cloonan. (Tr. at 21). The ALJ explained that she gave little weight to Dr. Hancock's opinion because Dr. Hancock completed an RFC questionnaire at the direction of Claimant, after seeing Claimant for only three clinical sessions, and Dr. Hancock specifically noted that she assessed moderate deficiencies in social functioning and concentration based on Claimant's self-report. (*Id.*). The ALJ cited that Claimant thereafter discontinued treatment with Dr. Hancock and declined group therapy. (*Id.*). Furthermore, the ALJ cited Claimant's hearing testimony that she was prescribed only medication management for mental health symptoms, and there was no evidence of exacerbation of her symptoms requiring hospitalization. (*Id.*).

The ALJ likewise gave little weight to Dr. Cloonan's opinion that Claimant was

limited to simple instructions and routine work activity without production schedules or more than occasional interactions with the general public. (*Id.*). The ALJ determined that such assessment was inconsistent with Claimant's conservative mental health treatment and daily activities, including her ability to drive, manage finances, pay bills, and use her computer. (*Id.*). The ALJ again noted that there was no evidence that Claimant's symptoms exacerbated to the point that she visited the emergency room or required psychiatric hospitalization. (*Id.*).

The ALJ's reasoning is supported by substantial evidence. In February 2015, Claimant's oncologist, Dr. Cohen, prescribed Effexor for Claimant's "mild, previously unrecognized depression." (Tr. at 884). Claimant reported worsened symptoms in November 2015 and Dr. Cohen adjusted her medication, although her examination showed that she was oriented in all spheres, had no agitation or anxiety, and displayed appropriate behavior, normal attention span and concentration, and no psychiatric issues. (Tr. at 888-89). Claimant was referred to psychologist Dr. Hancock, who she saw for a few psychotherapy sessions. (Tr. at 832, 837, 846, 865). Dr. Hancock noted some progress at each session before Claimant discontinued treatment. Claimant continued to reported depression to her primary care provider, and she was prescribed Effexor, but she also intermittently denied having any depression or anxiety. (Tr. at 42, 47, 57, 66, 946, 951, 955, 993, 998). As referenced by the ALJ, there are no records that Claimant received more aggressive mental health treatment, and she was never hospitalized for exacerbation of symptoms.

The mere fact that Claimant was diagnosed with mental conditions and prescribed associated medications did not establish that she had severe mental impairments. Rather, the ALJ appropriately considered whether the clinical records

demonstrated any associated functional limitations. *Cook*, 2016 WL 5661348, at *8 (citing *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (noting that mere presence of a psychological disorder is not disabling unless accompanied by a showing of related functional loss)). The ALJ found that Claimant's daily activities, the objective evidence of her mental functional abilities, and conservative treatment without any significant exacerbation of symptoms indicated that Claimant's mental impairments were non-severe.

Furthermore, even assuming *arguendo* that the ALJ erred in analyzing Claimant's mental impairments at step two, such error would be harmless in this case because the ALJ found that Claimant had other severe impairments, proceeded with the sequential evaluation, and considered the effects of Claimant's mental impairments at subsequent steps of the sequential evaluation. In fact, the ALJ specifically stated that the step two finding was not an RFC assessment and specified that she incorporated the degree of limitation found in the paragraph B mental function analysis into the RFC finding. (Tr. at 16); *see Cook*, 2016 WL 5661348, at *9-10 (stating that even if the ALJ erred at step two with respect to the claimant's mental impairments, such error would be harmless because the analysis proceeded and the ALJ stated that the RFC determination reflected the degree of limitation found pursuant to the special technique analysis). The ALJ provided thoughtful explanation for her assessment of Claimant's mental functional abilities, and the justification is supported by the record of Claimant's daily activities and her conservative treatment.

Overall, Claimant fails to identify any relevant conflicting evidence that the ALJ overlooked concerning her mental impairments, nor does she show that the ALJ failed to apply the correct law or made any other error that rendered her decision unsupported

by substantial evidence. Claimant is simply asking the court to re-weigh the medical evidence and reach different conclusions than the ALJ, which is not the court's role in reviewing the Commissioner's decision. The Court must uphold the Commissioner's decision if it is supported by more than a scintilla of evidence. It is not the province of the Court under 42 U.S.C. § 405(g) to weigh the evidence, perform the special technique to evaluate the severity of a claimant's mental impairments, or assess Claimant's RFC. Where, as in this case, the ALJ considered the relevant evidence, provided logical reasons for the conclusions reached, applied the correct legal standards, and there is more than a scintilla of evidence to support the ALJ's findings, the Court must affirm the Commissioner's decision.

Therefore, the undersigned **FINDS** that the ALJ's step two and RFC analyses of Claimant's mental impairments are supported by substantial evidence. *See, e.g., Cook*, 2016 WL 5661348, at *7 (finding that the ALJ's step two finding that the claimant's mental impairments were non-severe and posed no more than mild functional limitations, contrary to the agency psychologist's opinion that the claimant had moderate difficulties in maintaining social functioning and concentration, persistence, or pace, was supported by substantial evidence).

### D. Fatigue

Claimant's final challenge to the Commissioner's decision argues that the ALJ erred in not including RFC limitations related to her fatigue. However, the ALJ explicitly considered Claimant's fatigue and concluded that it was a basis, along with her other impairments, to restrict Claimant to a limited range of sedentary work. (Tr. at 20). The ALJ discussed the relevant evidence, noting that Dr. Cohen documented Claimant's fatigue secondary to treatment, but Dr. Cohen stated that Claimant was able to carry on

normal activities with effort and was doing some woodworking. (Tr. at 18-19). The ALJ cited that Dr. Cohen also recorded that despite Claimant's reported fatigue she scored 80 percent on the Karnofsky Performance Scale in December 2015, and she scored 90 percent on the Karnofsky Performance Scale in February 2016, indicating that she could carry on normal activities with only minor signs or symptoms of her disease. (Tr. at 19). The ALJ noted that in April 2016, Dr. Cohen assessed that Claimant was stable, rated her pain zero on a ten-point scale, and was fully active and able to perform all normal activities. (*Id*.). The ALJ further discussed that although Claimant continued to complain of fatigue to her primary care provider, she had normal physical examinations. (Tr. at 19). Finally, the ALJ mentioned that Claimant's daily activities indicated her ability to function despite her fatigue.

The ALJ's analysis is supported by substantial evidence. Claimant complained of fatigue secondary to treatment in December 2015, and she was encouraged to increase her physical activity. (Tr. at 862). She continued to complain of fatigue to Nurse Spurlock, but there were no significant issues on her physical examinations. (Tr. at 42-43, 57-58, 66-67, 72, 947, 951, 952, 964, 993, 998). Claimant was again encouraged to exercise. (Tr. at 993). Claimant fails to identify any relevant functions or contradictory evidence that the ALJ overlooked regarding her fatigue. The ALJ expressly considered the effects of her fatigue and the pertinent evidence. Ultimately, it is the responsibility of the ALJ, not the Court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Therefore, the undersigned **FINDS** that the ALJ's analysis of Claimant's fatigue is supported by substantial evidence.

## VIII. <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 11); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 12); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  November 27, 2019

Cheryl A. Eifert
United States Magistrate Judge